Team 1095, it's Dr. Subah Packer v. Trustees of Indiana University. Good morning, Mr. Kelleher. Come on up. I always feel like a game show host when I say, come on up. Thank you, Your Honor. Good morning. May it please the court, Christopher Kelleher on behalf of the opponent. Dr. Packer endured significant discrimination and retaliation at Indiana University. The dislasted 13 years from her first equal pay grievance until her termination is a testament to her fortitude and Dean Brader's perseverance in getting rid of her. There is no question Dean Brader and Dr. Sturek wanted Dr. Packer out. The only question is why. Was it gender, retaliation, or work product? This is a jury determination. Here is my problem. You have done a tremendous job up here. Thank you. But there were many problems with the representation below. And what we have to try and understand is how we, sitting where we sit, can get past what did not happen in the district court. For instance, it does not seem to me that the factual statement that Dr. Packer included in the memorandum below complied with Local Rule 56-1B in the sense that it did not respond to the university's factual statement. It did not identify what factual disputes there were. And that failure, how does that failure below affect our review of the facts? Certainly, Your Honor. I understand the court's concerns and obviously I will concede that this summary judgment response was not perfect. However, it was not anemic. And this is not an instance where a party put forth a poor effort in the district court and it is trying to be resuscitated on appeal. The summary judgment response was 32 pages. It cited 40 cases. It attached 57 exhibits. Admittedly, not every exhibit was referenced in the response. Do you agree, Mr. Kelleher, that a district judge is not required to do an unguided search through the depositions and affidavits? I would agree with that, Your Honor. And you agree that it is not sufficient to cite an entire deposition as support for factual dispute? I would concede that. And also not sufficient to cite an entire long affidavit? Yes, Your Honor. So that's where I have problems. Understandable, Your Honor. One point I would make is that the district court, in its opinion, did not actually say that Dr. Packer violated Rule 56.1, local Rule 56.1. No, but you do attack the district judge for having overlooked a lot of evidence that was never specifically cited to her, correct? Well, I tried to walk a fine line between not attacking for evidence that was not properly before the court. But I would say again that the district court did not specifically find that she violated local Rule 56.1. And the decisions that Indiana cites in its brief, those decisions essentially . . . parsing all of the violations of local Rule 56.1, but will simply disregard assertions that are not properly supported. I don't know that we need a more specific finding from the district judge on that point. Okay, Your Honor. But again, I would just point to those cases that Indiana did cite. They involved instances where the district court explicitly held that a local rule was violated. And so I would ask the court to at least take consideration of that point. And admittedly, could things have been argued differently in the district court? Certainly. In hindsight, as always, 2020, it's easy to say that certain evidence . . . We specialize in 2020 hindsight in this court, so . . . It's easy to say certain evidence could have been highlighted and other evidence downplayed. But again, if that's the basis for waiver, I would respectfully assert that that opens a can of worms. That would? That would open a can of worms. If the basis for waiver is that, essentially, arguments are more fleshed out on appeal than in the district court. The problem is that the arguments weren't fleshed out below. I mean, you have marshaled evidence in support of claims, but the university is correct that we're confined to what arguments and evidence were put forth below. Otherwise, what we would be doing up here is giving appellants do-overs. And that's just not what we can do. We simply can't. But, let's talk about Dr. Packer's discharge. Why is there a genuine dispute as to whether she was meeting the university's legitimate expectations? For instance, I gathered that, with respect to her grant applications, that the problem wasn't simply that she wasn't obtaining grant money, but that her grant applications either didn't meet the requisite scores or she wasn't supplying evidence of the scores. Well, Your Honor, part of the problem with the criteria, whether it was the grants, whether it was the publications, is who is the gatekeeper? And that gatekeeper is Dr. Sturek. And there's significant evidence in the record, some of which was before... But attacking the decision-maker doesn't really respond to that point, that the objective evidence showed she was not meeting the department's performance criteria. Well, along those lines, Your Honor, part of the problem is Dr. Sturek, for example, on one grant application, essentially sabotaged it. The drive application, to be specific. When was that? When was that? I believe that was 2008 or 2009. That's four or five years before the discharge, correct? Yes, Your Honor. Okay. So if we could return to Judge Rovner's question about whether she was meeting performance standards. Well, I think there's a question of fact as to the fact that she contends that certain grants and publications should have been recognized, that they met certain criteria. Additionally, there was another application, and again, this does go back to 2008, 2009, a $12.5 million grant that Dr. Sturek essentially said was not applicable. So I think there's issues of fact as to whether these grants met the standards or whether Dr. Sturek was simply presenting a fait accompli and just denying every grant application or, more importantly, determining that they did not fit the criteria. You know, I mean, for instance, as evidence of pretext, Dr. Packer asserted that Dr. Sturek had boasted that he was following orders to get rid of her. But she cited downstairs no evidence whatsoever in support of that assertion. That's pure waiver. And I recognize that it's not fair to the district court judge for this court to reverse when a substantial amount of the evidence was not for it. I recognize the unfairness of that. But I would point out that the evidence, the arguments that were raised in the district court, did show that there was something amiss, and that there were inferences of gender discrimination and retaliation. And one thing I would point to as far as the retaliation goes is one of the final straw that brought the camels back when she was pulled from a course that she had taught for many years, and it was four days after Dr. Sturek was served with a complaint. That's a textbook example of retaliation. So I think there is what little evidence, what little arguments were made before the district court, I think there is enough there to at least raise an inference, and that summary judgment should have been denied because there are issues of fact. Insofar as the breach of contract claim is concerned, what evidence in the record is there that tells us what the material terms of the contract were? In all due candor, there's none, Your Honor, other than, if I may say, other than Indiana never disputed that Dr. Packer had tenure. There's no dispute that she was tenured, but she principally relied on the university's academic handbook as a description of her rights when that handbook contains an express disclaimer that it creates neither a contract nor any legal rights. I understand, Your Honor. There's no witness who said, here's what the terms are, right? No, but there is a reference in the summary judgment response, either there or in the SIR reply, that discusses letters. It says they exist, right? But she didn't provide copies. I can see that point. So we don't know, do they exist, do they not exist? And it shouldn't have been difficult, should it have, to identify the source of her contractual rights and to explain in concrete terms what significance Indiana law attaches to tenure. And none of that was done by the attorney below. I don't disagree with that, Your Honor. And one additional point, although it probably does not help my case, is that most, if not all, of this evidence, including these letters, were attached as trial exhibits for the trial. But obviously I recognize that that's essentially neither here nor there. Save your time. I will. Thank you, Your Honors. Yeah. Hello. Hello. Thank you. Shall I begin? You may fire when ready. Thank you. We have two completely different names on our card for our cards. This is Ms. Boshkoff. For who is here today. They're for the next case. Thank you. Thank you, Your Honor. May it please the Court, my name is Ellen Boshkoff. I represent the appellee, the trustees of Indiana University, and we're here, of course, on the appeal from the grant of summary judgment. This case, in a nutshell, on the merits, involves a chronically poor-performing faculty member who was discharged after an extended process for persistent neglect of duties. The poor performance involved failing to meet specific, objective, measurable department standards over an extended period of time. And as Dean Brader stated in his dismissal recommendation, the cumulative record was more than just neglect. It revealed refusal to meet expectations and insistence on Dr. Packer's right to define her own standards. Dean Brader found this constituted misconduct over time. The Executive Vice Chancellor agreed, and so did Chancellor Vance. Now, while it is admittedly a rare case to find a tenured faculty member being dismissed under such circumstances. Does tenure carry with it a defined set of rights under Indiana law? And if not, what would be the relevant evidence to cite in support of her claim? I think that tenure is best described in this circumstance as a concept. It is a concept of reciprocal obligations on the part of the faculty member and the university. There is not a case defining tenure under Indiana law, nor is there a contract defining tenure under Indiana law. What I can tell you is that Indiana University, with respect to Dr. Packer's dismissal, followed the academic handbook, which includes the statements regarding tenure, and the supplement to the academic handbook, which sets forth specific procedures for the termination of a tenured faculty member. And there has never been any allegation in this case that those procedures were not followed. In fact, they were followed to a T through the administrative process that went from the department chair to the dean to the executive vice chancellor to the chancellor, and at every step of the way, Dr. Packer was given an opportunity to respond. So as far as the contract claim, I don't myself understand what she's saying constitutes the contract, but in this case I think what we have is an expression of tenure as a statement of principles, which IU certainly believes that it followed. The concept of reciprocal obligations sounds a lot like a contract, right? It does sound a lot like a contract. And I guess I have the same question. Do you agree that she did, in fact, have tenure? We do agree she had tenure. Whatever that means. Correct. And so where does one look for the terms of contract? Is it an Indiana statute? There is no Indiana statute. The statutes that are cited in the brief are at elementary school level, the teacher tenure process. I would say it's the academic handbook, and the academic handbook talks about the reciprocal rights and obligations. It expressly states that it's not a contract. But, again, if you look at the academic handbook, that's the document that IU followed in proceeding through this dismissal process. So despite the disclaimer, that's where one looks to see what the terms of tenure mean? I believe so, yes. And, again, we can debate what tenure means, but there's an academic concept of tenure and academic freedom, and there's a legal concept called contract. And I don't believe that there's been a contract established in this circumstance. I'm still struggling to understand what the contract supposedly is or how the terms are breached. Our best understanding of it is the academic handbook, which is what we followed. What do we make of the evidence that suggests that Dr. Sturkey, I hope I'm pronouncing that correctly, said that he intended to get rid of Dr. Packer? How should that factor into our analysis? That is largely based on Dr. Packer's affidavit. However, I think the fact that Dr. Sturkey wanted to get rid of Dr. Packer, if we believe her affidavit as true and supported by personal knowledge, only shows that he wanted to get rid of her. It doesn't show that he wanted to get rid of her because of gender. It doesn't show that he wanted to get rid of her because of retaliation. And, in fact, if you think about the chronology of this case, the allegation is that when Dr. Sturkey took over the department, he immediately started criticizing her relating to her performance. That predated any complaints that she ever made about Dr. Sturek. So his early on assessment of her performance and desire to get rid of her can't possibly support a retaliatory motive. And there's no evidence linking it to gender either. I gather that it was somewhat unusual to initiate the discharge of a faculty member based on anonymous student reviews. None of us would be sitting up here if that were the case. Can you talk a moment about how those reviews factored into the decision to get discharged? I would say they were not a very significant factor. If you look at the discharge and what's cited by Dr. Sturek, she had a chronic history of unsatisfactory performance. At the time of the recommendation, six out of seven evaluations were unsatisfactory, and there was another one that was in the wings. He then also cited the fact that she had failed to meet the performance improvement plan. And the third thing he said a concerning factor was the uniformly negative student evaluations, which are in the record, and I honestly, Your Honor, they are quite shockingly negative. But I would say that they're all of these things combined, but the student evaluations were not dispositive. How did she win all these wonderful awards if she is... I mean, it's two different people that we're viewing. Yes and no. I mean, I think when you get down to this case, you have to understand we're talking about specific departmental standards that are very objective and measurable, and they have a funding component and a research component that's very specific. Most of these awards don't relate in any way. In fact, I would say none of them relate in any way to these departmental standards. And just as the line of authority that opinions of non-decision-makers don't undermine the decision-maker's assessment, if the American Psychological Society, for whatever reasons, chooses to give Dr. Packer an award for teaching, that does not mean that in that particular year she published, which indisputably she did not, or she submitted grant applications. You mean the students love you, but you're not producing what the faculty or the school expects of you. That's right. And on this issue of departmental standards, I just want to just pause for a moment. It's a year-by-year analysis of whether or not you meet standards. In the court below and in this court, we have explained what she did wrong. She didn't submit grant applications. She didn't publish, and we have that out of her response to the request for admission. She published a total, I think, of three or four articles over a multi-year period. But it's a year-by-year basis. And even to this day, we still have not heard the rebuttal to that. Even up here in this court, we haven't heard, no, that's not true, I published this article, I published that article, I submitted this grant, I submitted that grant. We're still not hearing it now. What we're hearing about are other things that do not prove that she met departmental standards. So, yes, I agree that the fact that she got awards mostly from external agencies is impressive. Quite a few of them are out of date. Several of them are nominations, not awards. But she did receive some awards. But that doesn't substitute for meeting the standards of the department, which, indisputably, she did not do. Could we spend just a moment on what we know about Dr. Packer's publication record and why she wasn't given credit for some of her publications? I ask that because the argument is that she wasn't given appropriate credit for publications which were actually invited. Correct. The publication standard is very specific, and it's in the departmental guidelines but also in Dr. Stirk's affidavit. The requirement is to be a first or senior author, and the reason for that is because those are the people that have the significant intellectual contributions to the project. It has to be a peer-reviewed, full-length research manuscript, not an invited editorial. It needs to be something that reflects research and scientific principles. And then the requirement is an average of three over a three-year period, basically because you might have two one year and none the next, and so there's an averaging. If you look to Dr. Packer's responses to the request to admit, and that appears at docket 113-17, we asked her specifically for every single year, do you admit or deny that you did not publish a peer-reviewed, full-length research manuscript that year? And in that response, she indicated that she had two in 2003-2004, none in 04-05, none in 05-06, one in 06-07, none in 07-08. Of course, she has a heavier teaching schedule than anyone else in the department. And I'm sorry, I'm probably belaboring the point, but we are basing our publication history on those responses to the request to admit, and also on Dr. Stirk's affidavit, where he testified as to these facts. And again, this gets back to we did a year-by-year analysis of her performance, and that hasn't been rebutted even to this day. The same issue relates to the funding. We've heard vague assertions of other faculty members potentially having funding issues. The departmental standard requires that you either have funding, which is 15% of your salary support, or submit two grant applications per year, receive satisfactory scores. As you'll see in the record, at various times during her employment, Dr. Packer flat-out refused to submit scoring to Dr. Stirk, saying she thought it was unethical. And even using the exhibit where they say she submitted ten grant applications over a multi-year period, that still doesn't even meet the quantitative standard, much less show that she received the satisfactory scores. So the objective evidence in this case is that she simply did not meet the performance standards. Now just ever so briefly to talk about the district court's analysis as it related to the gender discrimination claim. And by the way, I should mention that we do believe that the gender discrimination claim is barred due to failure to exhaust administrative remedies. The district court did not base her opinion on this. That's as to the discharge. As to the discharge, solely as to the discharge. When Dr. Packer filed her charge after she was terminated, inexplicably she did not allege gender discrimination. I have to admit I was surprised by that. Her charge indicates only retaliation. It doesn't check the box or say anything about gender discrimination. Now counsel has argued on appeal that the two charges that she filed should be considered related such that one can pull in allegations from the other. Not only am I not aware of any case law that would support that, but the first charge was long since dismissed by the time the second charge came along. There was a two-year gap between those. And if you think about the exhaustion requirement, it's not just to put us on notice. And I won't dispute that IU knew she was alleging gender discrimination at this point in time, but it's also to put the EEOC on notice to allow the EEOC to investigate. That didn't happen here, so the claim should be barred. I also think the district court's analysis was correct. There was very little evidence that was submitted to the district court on the gender case. The district court found there was no direct evidence of discrimination, and Dr. Pecker barely addressed the indirect case, didn't even discuss the prima facie case. In fact, at no point in the court below did she argue that she was performing satisfactorily, did she present evidence of a relevant comparator, or did she present any cogent evidence of pretext. And in fact, as it relates to her equal pay claim, there was no identification in the court below of anyone that she identified as comparable to her. We did present evidence in the record, very detailed evidence, explaining her performance history and the reason for her compensation over the years, and there was essentially no response to that. So for the reasons stated in our brief, I realize the case appears factually complex, but at the end of the day, we believe that the district court's decision was well supported and should be affirmed. Thank you. Okay, Mr. Kelleher, you have four minutes. Thank you, thank you, Your Honor. As to the anonymous student evaluations, I think it's very telling that Dr. Sturek used the evaluations of one class from one semester out of 55 semesters of teaching against Dr. Packer. Well, Ms. Burschkopf said that there were four such and one in the wings. I'm not aware of that, Your Honor, but to the point of these anonymous evaluations, there were peer reviews of the same class that were laudatory of Dr. Packer. From previous years? I believe, Your Honor, from this class, my understanding of the record. Where do we find those? Yeah, where will we find those? Well, they're cited in our brief. I'm not sure. I believe it's her affidavit, Dr. Packer's affidavit, and I'm not 100% if they reference those peer reviews, but I do believe those peer reviews were not part of the record. The reviews themselves were not part of the record, but she does reference those in her affidavit. And were they cited specifically to the district court in opposition to summary judgment? No. No. Thank you. No. Additionally, there was no evidence that these anonymous student evaluations were used against male professors, and there's no evidence that Dr. Sturek used this class at issue, compared this class at issue to her other classes. So I think these anonymous evaluations were a pretext, especially when considered that Dr. Sturek had been served with this complaint four days prior. Additionally, these evaluations were not just one part of the puzzle. These were referenced in I believe it was Chancellor Bantz's letter as to why she was being terminated. So they were important. They were integral. As to counsel's claim that Dr. Sturek wanted to get rid of her, that this was only from Dr. Packer's testimony, that's not true. There were a number of witnesses. Admittedly, some of these witnesses, some of this testimony was not presented to the district court properly, but Dr. Pavelko was, and he was the interim chair in 2003-2004, and he said that he and Dean Breider and Dr. Sturek met and devised ways to get rid of her, to terminate her, to remove her to another campus. So, again, this goes back 9, 10 years, this desire to remove her, and this, animus, again, was gender-based and retaliation-based. Even considering, admittedly, the limited evidence that was presented to the district court. And if there are no further questions, I would ask the court to reverse and thank the court for its time. Thank you very much. Thanks to both counsel. The case will be taken under advisement. Thank you.